## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **NO.** |
| **v.** | : | |
| | : | |
| **GENERAL ELECTRIC COMPANY,** | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") alleges that:

## SUMMARY

1.      Starting in 2002 and continuing through 2003, the General Electric Company ("GE"), a publicly-traded company headquartered in Fairfield, Connecticut, acting primarily through senior corporate accountants, made a number of improper accounting decisions which resulted in its reporting materially false or misleading results in its financial statements and earnings reports in 2002 and 2003 and which required additional adjustments through 2006.  Beginning in 1995 and continuing through the filing of the Form 10-K for the period ended December 31, 2004, GE met or exceeded final consensus analyst earnings per share ("EPS") expectations every quarter.  On four separate occasions in 2002 and 2003, however, high-level GE accounting executives or other finance personnel approved accounting which was not in compliance with

Generally Accepted Accounting Principles ("GAAP") so as to increase earnings or revenues or to avoid reporting negative financial results. In one instance, the improper accounting allowed GE to avoid missing analysts' final consensus EPS expectations. The four accounting violations are as follows: (a) beginning in January 2003, an improper application of the accounting standards to GE's commercial paper ("CP") funding program to avoid unfavorable disclosures and an estimated approximately $200 million pre-tax charge to earnings; (b) a 2003 failure to correct a misapplication of financial accounting standards to certain GE interest-rate swaps; (c) in 2002 and 2003, end-of-year "sales" of locomotives to financial institutions in order to accelerate over $370 million in revenue; and (d) in 2002, an improper change to GE's accounting for sales of commercial aircraft engines spare parts that increased GE's 2002 net earnings by $585 million.

 2. By engaging in the practices and transactions alleged in this Complaint, GE violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 under the Exchange Act [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

 3. Accordingly, the Commission seeks entry of a permanent injunction against GE prohibiting further violations of the federal securities laws as well a civil monetary penalty.

## JURISDICTION

4.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15

U.S.C. §§ 78u and 78aa].

5.      The Commission brings this action pursuant to the authority conferred

upon it by Sections 20(b) and (e) of the Securities Act [15 U.S.C. § 77t(b) and (e)] and

Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

6.      In connection with the conduct alleged herein, GE, directly and indirectly,

made use of the means or instrumentalities of interstate commerce, the mails, the

facilities of national securities exchanges, and/or the means and instruments of

transportation or communication in interstate commerce.

## DEFENDANT

7.      GE, a New York corporation with headquarters in Fairfield, Connecticut,

is a diversified technology, manufacturing, media, and financial services company.  At all

relevant times, GE's common stock was registered with the Commission pursuant to

Section 12(b) of the Exchange Act and was traded on the New York Stock Exchange.

GE wholly owns General Electric Capital Services, Inc. ("GECS"), a holding company

which in turn wholly owns General Electric Capital Corp. ("GECC").  GECC contains

the consumer finance and commercial finance operations of GE and also provides

equipment financing and leasing to a variety of industries.  GE's fiscal year ends on

December 31.

## THE VIOLATIONS

### I.   GE's Improper Treatment of CP Hedging

8.     In the period from January 2001 though December 2006, GE used hedge accounting to account for interest rate swaps held for the purpose of hedging interest rate exposure on its CP issuances, resulting in smoother reported earnings.  In late 2002 and early 2003, GE learned that continuing to apply its existing hedge accounting method for its CP program would require it, among other things, to report certain fluctuations in the value of its CP interest rate swaps.  Rather than reporting these fluctuations, however, GE changed the hedge accounting approach it used in a way that it knew or was reckless in not knowing did not comply with accounting rules.

9.     Specifically, in early 2003, GE changed its CP hedge accounting approach (1) to avoid reporting a disclosure that might have led to the loss of hedge accounting for its entire CP program and (2) to avoid recording what GE estimated to be an approximately $200 million pre-tax charge to earnings.  For months prior, GE had sought to solve its CP hedge accounting issues with proposals based on its established CP hedging approach.  None of the proposals permitted GE to avoid certain potentially harmful disclosures.  Just days before GE's quarterly financial data was to be released in early 2003, however, GE developed  an entirely new approach that, when applied retroactively to transactions that occurred months before, allowed GE to obtain the desired accounting results and avoid required disclosures that GE personnel feared could be harmful.  The new approach violated GAAP.  As a result, GE improperly overstated earnings in the fourth quarter of 2002 by an amount in excess of 5%, and thereby met its revised consensus EPS estimates.  From 1995 through December 31, 2004, GE had met

4

or exceeded final EPS expectations every quarter, in some cases after downward revisions during the quarter.

10.     Application of the new approach resulted in the publication of materially false statements and materially false omissions in GE's Form 10-K filed with the Commission in March 2003 for fiscal year 2002.

A.     **GE's Original Approach to CP Hedging**

11.     At all relevant times, GE issued CP.  CP is an unregistered, unsecured commitment to pay the CP purchaser an agreed principal amount at an agreed rate of interest on a given maturity date.  In exchange for this commitment, the purchaser pays cash to the issuer on the date of the CP issuance.  GE's CP maturity dates ranged from 1 to 270 days.

12.     GE used the proceeds from its CP issuances to fund many of its financial assets, such as loans or leases.  Many of those financial assets had long, fixed-term interest rates.  Because the rolling CP issuances exposed GE to fluctuating interest rates over time, funding those fixed assets with the proceeds of CP issuances exposed GE to interest rate risk.

13.     To hedge the risk, GE entered into corresponding interest-rate swaps with third parties, which effectively converted the variable rate CP interest payments into fixed rate interest payments and reduced GE's exposure to changing interest rates.

14.     Financial Accounting Standards Board Statements of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133") governs the accounting for derivative financial instruments such as interest-rate swaps.  It generally requires that instruments meeting the definition of

derivatives, including interest-rate swaps, be recorded at their fair value, and that any changes in their fair value be reported in earnings on a quarterly basis. Given these requirements, fluctuating values of interest rate swaps could cause a company to experience significant earnings volatility.

15.     To allow companies to address this volatility, FAS 133 permits special "hedge accounting" for certain hedge relationships provided specific criteria are met. One type of hedge accounting – cash flow hedge accounting – allows an issuer to keep certain changes in the fair value of its derivatives from being reflected in earnings. Specifically, if certain criteria are met, FAS 133 allows issuers to instead measure and record on their balance sheets the difference between the value of the derivative (*i.e.*, the interest-rate swap) and the value of the underlying hedged risk (*i.e.*, the interest on the floating rate debt), which is referred to as the "ineffectiveness" of the hedge. This approach generally results in less volatility in earnings.

16.     In order for an issuer to qualify for hedge accounting, FAS 133 requires, among other things, that the issuer comply with two principal requirements: (1) a documentation requirement and (2) a specificity requirement.

17.     In connection with the documentation requirement, an issuer must create what is known as hedge documentation at the inception of the hedge relationship. This official written documentation must describe, among other things, the risk being hedged, the date the future transactions to be hedged are expected to occur (known as "forecasted transactions"), and the strategy that will be used to identify the forecasted transactions. The entity must follow the terms of this documentation throughout the life of the hedge and may not substantively alter it. If the documentation is not followed, the entity loses

6

the special hedge accounting and must record the fluctuations in the value of the hedge going forward.

18.     The "specificity" requirement means that the issuer must describe the forecasted transaction in the issuer's documentation with sufficient specificity such that when a transaction occurs, it is clear whether the transaction is a hedged transaction.

19.     FAS 133 also provides that to qualify for hedge accounting, the forecasted transactions must be "probable" of occurring.  FAS 133 provides that a "pattern" of failed forecasted transactions could disqualify an entity from using cash flow hedge accounting for similar forecasted transactions.

20.     For GE, FAS 133 became effective on January 1, 2001.  By this date, GE had developed a methodology to hedge the variable interest rates it paid on the CP it issued.

21.     GE divided the CP it expected to issue into groups or "buckets" based on the CP's average maturity dates (i.e., CP which matured between 8-74 days had an average maturity date of 30 days), and entered into interest-rate swaps with a reset date of the same duration (i.e., a 30 day swap) which it used to hedge a portion of that corresponding bucket of CP.

22.     GE's original intent, as reflected in its hedge documentation, was to group the CP into buckets that had fixed parameters.  These parameters were established based on GE's historical issuances of CP with the goal of having the CP issued in a bucket in a given period exceed the value of the corresponding swaps, in which case there would be no failed forecasted transactions.

7

23.     GE's hedge documentation contained a table describing the parameters of the CP buckets.  More specifically, the documentation for GE's U.S. dollar CP stated:

The maturity buckets are as follows:

| Bucket | Weighted-Average |
|--------|------------------|
| 1-7 Day | 2 Days |
| 8-74 Day | 30 Days |
| 75-120 Day | 93 Days |
| 121-174 | 140 Days |
| 174+ | 176 Days |

24.     If, for a particular bucket of CP, the size of the interest-rate swaps exceeded the amount of CP issued in a period, GE would be "overhedged," meaning certain forecasted transactions (*i.e.*, the issuances of CP to be hedged) would not have occurred.  In this situation, GE would have failed forecasted transactions.

25.     From January 2001 through mid-2002, GE accounted for its CP hedging program in a manner consistent with the fixed bucket parameters set forth in the table of its hedge documentation.

**B.      Application of GE's Original Method Results in Overhedges with Negative Accounting and Disclosure Ramifications**

26.     In or about the fall of 2002, GE realized that, due to changes in market conditions and its corporate funding strategy, it had issued insufficient CP in multiple consecutive periods in 2002 to cover the interest-rate swaps that it was using to hedge two buckets of CP identified in its documentation (U.S. dollar CP in the 30-day bucket and Australian dollar CP in the 30-day bucket).  This meant that certain forecasted transactions had almost certainly failed to occur (*i.e.*, GE had attempted to hedge CP that had not been issued).

27. In early November 2002, GECC personnel proposed to senior personnel in GE's corporate accounting group that GE "borrow" CP from other buckets described in the documentation to make up for shortfalls in the deficient buckets. By using CP from other buckets, the personnel suggested, GE could still claim that all forecasted transactions were probable of occurring and they could avoid having failed forecasted transactions.

28. In November and December 2002, the borrowing approach was rejected by both GE's outside auditor and members of GE's internal audit staff ("Corporate Audit Staff"). Members of the Corporate Audit Staff believed, among other things, that (1) the buckets of CP described in the original documentation were required to be used when identifying the subsets of CP to be hedged; (2) CP from other buckets could not be used to supplement a shortfall; and (3) GE had experienced an overhedge of U.S. dollar CP in the second and third quarters of 2002. As GE became aware, GE's outside auditor also rejected the borrowing approach, similarly concluding it was not consistent with the existing hedge documentation because the documentation did not provide for borrowing among buckets.

29. At GE's request, GE's outside audit team asked its national office whether failed forecasted transactions had to be disclosed publicly, and also whether any amounts reclassified to earnings as a result of those failures also had to be disclosed irrespective of their quantitative materiality. The outside auditor's national office confirmed that both the fact of the failures and the amounts reclassified to earnings as a result were items that required disclosure.

30.     In a December 17, 2002, email to senior GE accounting personnel, a GE accountant described how the "borrowing" approach was inconsistent with GE's existing documentation. The email went on to explain that the outside auditors and GECC personnel had both concluded that there were failed forecasted transactions in the U.S. dollar 30-day bucket. The email described a similar overhedge issue in the Australian dollar 30-day bucket.

31.     A senior accountant in GE's corporate accounting group responded the next day as follows:

> How do we intend to deal with the SEC "one strike and you're out" position? Doesn't this mean that potentially we can no longer qualify for cash flow hedging??? Urgent that you find disclosures of others who have had cash flow failures. Isn't this an extraordinarily big deal?

The reference to the "SEC 'one strike and you're out' position" concerned a December 2000 speech given by an SEC accounting fellow discussing how a pattern of failed forecasted transactions might negatively impact the ability to perform similar hedges in the future.

32.     Lost CP hedge accounting for GE would have forced GE to either (1) continue hedging CP but record future volatility in earnings; (2) continue to issue CP without hedging; or (3) find some other source of financing (such as longer-term debt at higher financing costs) to fund its fixed rate assets.

33.     Soon after sending the above email, the same GE accountant wrote another email, stating: "I just went back to the SEC speech on this point, and don't see any flexibility whatsoever. We've got to fix this."

34.     Thereafter, GE personnel continued to seek solutions to solve the overhedge problem. By late December 2002, GE realized that FAS 133 allowed

forecasted transactions to occur up to 60 days after the date they had been expected to

occur.  In other words, a forecasted transaction that occurred within this 60-day window

was not a failed forecasted transaction under FAS 133.  Application of the 60-day

window cured the shortfalls in the U.S. dollar 30-day bucket, but not those in the 30-day

Australian dollar bucket.

     35.    GE continued to be concerned about failed forecasted transactions in the

Australian dollar program and the potential ramifications that could flow from a

disclosure of those failures.  Throughout the end of December 2002 and into the early

part of January 2003, GE personnel explored multiple additional solutions to its

Australian dollar overhedges, all of which were rejected either internally or by GE's

outside auditors.

     36.    On January 4, 2003, a GECC accountant informed members of GE's

corporate accounting group in an email that they had not been able to come up with a

solution to the Australian CP overhedges.  As a result, he stated, there were failed

forecasted transactions in that program, and the issue of disclosure in the annual report

would need to be discussed.

     37.    On or about January 5 or 6, 2003, an outside auditor engagement partner

informed the GECC accountant that although the 60-day window had cured the

overhedges in the U.S. dollar program such that there were no failed forecasted

transactions, FAS 133 required that GE nonetheless de-designate the hedge for that

portion of the swap that did not occur as of the date they had originally expected to occur.

As a result, GE would lose hedge accounting for that portion of the hedge and would be

required to record changes in the swap's fair value in earnings for the current period and going forward.

38.     At the time, GE estimated that it would be required to immediately record a pre-tax charge of approximately $200 million.

### C.   GE Develops a New Methodology to Avoid Accounting and Disclosure Ramifications

39.     At a meeting late in the evening of January 6, 2003, GE personnel developed a new interpretation of the existing hedge documentation in an effort to avoid the conclusion of failed forecasted transactions and the corresponding pre-tax charge. Instead of using the buckets of CP defined by the parameters described in the documentation to determine which CP interest payments were being hedged, GE would use groups whose parameters changed – or "floated" – from reporting period to reporting period, depending on how much CP was issued in the period.  This approach meant that GE would never be overhedged unless it failed to issue an amount of CP in a given currency that at least equaled the total swap value outstanding in the currency.  To get around the table with the fixed parameters described in the documentation, GE accounting personnel, advancing a variation on an argument that had been made previously and rejected by GE's outside and internal auditors, asserted that that the parameters described in the documentation were merely "illustrative" and indicative only of what the groups would have been at a particular point in time.

40.     Under this proposed "floating bucket" methodology, GE would change the bucket parameters until it had enough CP in the group to match the size of the swaps hedging the group.  Under this approach, GE would not know until after the period (*i.e.*, after 30 days for the 30 day grouping) what CP was being hedged, which meant that GE

would not be able to identify the hedged interest payments until after some interest payments had already occurred.

41.     The creation of parameters after some of the hedged interest payments had already occurred did not satisfy the specificity requirements of FAS 133. In addition, this methodology conflicted with the GE hedge documentation, which, among other things, contained no mention of CP parameters floating or changing from period to period, contained a table with fixed bucket parameters, and described the CP in the buckets actually being hedged as a subset of the total CP in the bucket.  For these reasons, this methodology was not compliant with FAS 133 or GAAP.

42.     The next day, a senior GE accountant emailed a GECC accountant, asking:

> Are you engaged in the cp hedge effectiveness issue?  This is a potentially huge issue with big p&l effect . . .

43.     Later that day, an email from a member of the Corporate Audit Staff described the new "floating bucket" methodology.  First, in discussing the previous proposal to apply a 60-day window to the fixed buckets contained in the hedge documentation, the internal auditor stated:

> this was the one to go with until today . . . but when the initial quantification got finished today, it showed a $(200MM) or bigger hit would have to be considered, and [GECC] is now reconsidering and contemplating [the "floating bucket"] interpretation [].

Under a section entitled "Challenge", the internal auditor went on to state:

> documentation that exists (that has been created) says that the buckets are defined in a specific way (e.g. there is a 8-74 day bucket), and the documentation can't be changed, and FAS 133 says that "the hedged forcast [stet.] transaction shall be described with sufficient specificity (e.g. 8-74 days bucket, as treasury did), so that when a transaction occurs it is clear whether the transaction is or is not the

hedged transaction" . . . if treasury now makes the borders of the buckets flexible, this might not fly with the existing documentation

* [Outside auditors] . . . looking into this, and might struggle to agree with this . . . might come back with similar concern that they had when business said [groupings] "don't exist"/"documentation and policy are "illustrative" [stet.]

44.    On January 8, 2003, at a meeting attended by senior corporate accounting personnel at GE and members of GE's outside auditor, GE explained the new methodology.  Notwithstanding the language in GE's hedge documentation, during the presentation GE personnel asserted that (a) the bucket parameters in the official hedge documentation were intended to be for illustrative purposes only and (b) GE's original intent was for those parameters to be flexible or to change.

45.    At the meeting, GE distributed and reviewed a powerpoint presentation which described the following risks associated with the new method: (a) the specificity requirement of FAS 133 might not be satisfied; (b) the official hedge documentation, which contained "predefined parameters," might not be consistent with the new methodology; and (c) the methodology could be subject to "future debate" and "second guessing."  The presentation also described how application of the original methodology would result in (a) failed forecasted transactions through December 2004 in the Australian dollar program and (b) an approximately $200 million pre-tax charge in the U.S. dollar program that had to be recorded immediately.

46.    By the end of the meeting, GE approved the application of the new methodology subject to further review of GE's hedge documentation by GE's outside auditor.

47.    On January 9, 2003, the outside auditor sent an email to senior GE accountants listing the outside auditor's concerns with the new "floating bucket"

methodology. The concerns included (a) that it could be inferred that the parameters were fixed as set forth in the table in the hedge documentation; (b) that the documentation did not appear to support a key tenet of the new methodology, namely that the size of the CP bucket would always be equal to the amount of the swaps; and (c) that the new approach did not satisfy FAS 133's specificity requirements.

48.     Senior GE accounting personnel drafted responses to outside auditors' concerns. Notwithstanding the language of GE's hedge documentation to the contrary, the responses indicated that the parameters set forth in the documentation were "for illustrative purposes only" and "only intended to be applicable if the total notional of swaps exceeded the total CP in the program." Similarly, notwithstanding the language of GE's hedge documentation to the contrary, the responses also stated that the groupings in the hedge documentation were "provided as an example of what the maturity buckets could be at a point in time." In addition to the lack of support in the documentation, there was no basis for these responses in any other contemporaneous documents.

49.     Soon thereafter, GE began applying the new "floating bucket" methodology to its CP program. As part of that application, GE chose to apply it both (a) on a going-forward basis and (b) retroactively to CP issuances that occurred from January 2001 through the end of 2002. GE's retroactive application of this methodology permitted GE to avoid having to disclose failed forecasted transactions in its Forms 10-K filed with the Commission for fiscal year 2002, and also avoided it having to record a corresponding pre-tax charge that GE estimated to be $200 million. Prior to its utilization, neither GE nor its outside auditors sought to bring the new methodology to the outside auditors' national office for its review.

50.     On January 17, 2003, GE released its 2002 earnings and announced quarterly and annual EPS amounts that were precisely in line with revised consensus analyst expectations for GE.

51.     On March 7, 2003, GE filed its Form 10-K with the Commission for fiscal year 2002. The form included the following false statement relating to derivative transactions: "In 2002, there were no forecasted transactions that failed to occur." The filing did not disclose that forecasted transactions had failed to occur. By improperly changing its CP hedging methodology, GE also overstated its annual and fourth quarter 2002 pre-tax profits by approximately $200 million. Given GE's 2002 effective tax rate 20.2%, GE overstated its net income by approximately $160 million as a result of the new approach. Because GE originally reported a fourth quarter 2002 net income figure of $3,102 million, the improper change of methodology resulted in GE overstating its fourth quarter 2002 net income by an estimated 5.4%. In addition, the estimated pre-tax charge of approximately $200 million that GE avoided by switching CP hedging methodologies would have caused GE to miss its quarterly and annual consensus EPS estimates by approximately 1.5 cents. At the time, GE had last missed final consensus EPS estimates in 1994, some eight years beforehand.

52.     On January 19, 2007, GE announced that the staff of the Commission's Office of Chief Accountant had concluded in December 2006 that GE's CP hedging program as structured did not meet FAS 133's specificity requirements. As a result, GE stated that it was amending its 2005 Form 10-K to restate its financial statements for the years 2001 through 2005, and that it was also amending its Forms 10-Q for each of the first three quarters of 2006, to eliminate hedge accounting for the interest-rate swaps

entered into as part of GE's CP hedging program from January 1, 2001 ("CP Restatement").

**II.     Improper Shortcut Treatment Under FAS 133 for Swaps with Fees**

53.     Under FAS 133, an issuer seeking hedge accounting must assess effectiveness of the hedge, both at the inception and prospectively, and measure and recognize any ineffectiveness on a periodic basis (at least every three months). FAS 133, however, also provides for an exception to the assessment and measurement requirements for hedge accounting. This exception permits an entity to assume that the hedge relationship is perfectly effective as long as certain additional criteria are met. The exception, referred to as "shortcut," significantly reduces the on-going effort necessary to achieve hedge accounting by minimizing or eliminating the need to measure ineffectiveness periodically.

54.     Early in 2003, a GECC accountant became aware that GE was designating certain interest-rate swaps which included fees paid or received at their inception as "shortcut" swaps under FAS 133. Recognizing that the existence of those fees in the swaps almost certainly rendered them ineligible for shortcut treatment under FAS 133, GE (a) discontinued its practice of entering into swaps with fees going forward and (b) also notified GECC personnel that any swaps with fees actually entered into in the future would not be granted shortcut treatment.

55.     Despite these changes, GE did not correct the accounting for past swaps with fees that had already improperly received "shortcut" designations. Doing so would have required GE to go back and record the fluctuations in value for those swaps since their inception. GE personnel knew or should have known that the shortcut designation

was not appropriate for swaps with upfront fees and that hedge accounting was therefore inappropriate. GE should therefore have corrected the accounting for past swaps with fees that had been improperly designated as shortcut transactions.

56.     On May 6, 2005, GE filed an amended Form 10-K for the fiscal year ended December 31, 2004 to restate its financial statements for the years 2002 through 2004, and certain financial information for the year 2001 and each quarter in 2003 and 2004. The restatement reversed the effects of incorrect hedge accounting under FAS 133 for the improperly designated short cut transactions during the restated periods. Cumulatively, from 2001 through the first quarter of 2005, the restatement had the effect of increasing GE's reported net earnings by $381 million. The restated results reflected significantly increased volatility from quarter to quarter. For example, the restatement had the effect of increasing GE's 2003 reported net earnings in the first and second quarters by 9.6% ($287 million) and 11.9% ($450 million), and decreasing reported net earnings by 12.2% ($446 million) in the third quarter.

### III.     Improper Recognition of Revenue from Locomotive "Bridge Financing" Transactions

57.     In the fourth quarters of 2002 and 2003, GE improperly recorded revenue of $223 million and $158 million respectively for locomotives purportedly sold to financial institutions with the understanding that the financial institutions would resell the locomotives to GE's railroad customers in the first quarters of the subsequent fiscal years. The six transactions were not true sales and did not qualify for revenue recognition under GAAP. GE personnel at the business level orchestrated these transactions in order to improperly accelerate revenue recognition. A member of GE's corporate accounting group approved the accounting for these transactions despite learning that GE maintained

significant obligations that: (1) suggested that the risks of ownership for the locomotives had not passed and (2) should have precluded revenue recognition under GAAP.

### A.   The 2002 "Bridge Financing" Transactions

58.     In the spring of 2002, certain business personnel in GE's Transportation Systems unit ("GETS"), assisted by members of GE's Capital Markets group, explained to a senior accountant in GE's corporate accounting group that GETS expected to sell a significant number of locomotives to railroad end users in the fourth quarter of 2002, but that the railroads might ask to delay those purchases until the first quarter of 2003. The business team proposed that GE resolve this issue by selling the locomotives to "financial intermediaries" in the fourth quarter of 2002 and having the financial intermediaries then resell the locomotives to the railroads in the first quarter of 2003.

59.     The proposed structure was very similar to a financing arrangement. Under it, the financial intermediaries would profit not by selling the locomotives to the railroads at a higher price, but by charging GE certain fees. In most of the transactions that resulted, these fees were based on (1) an upfront commitment fee paid by GE to the financial intermediaries and (2) a London Interbank Offered Rate (LIBOR)-based interest charge on GE for each day between the "purchase" of the locomotives from GE and the subsequent sale of the locomotives to the end user railroads. During the May 2002 meeting and at subsequent meetings, these transactions were sometimes referred to as "bridge financings."

60.     Under GAAP, revenue generally cannot be recognized on a product sale unless delivery of the product has occurred. Delivery is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership.

61.     In May 2002, the senior accountant in GE's corporate accounting group expressed concern about recognizing the revenue in the fourth quarter upon the proposed sales of locomotives to financial intermediaries.

62.     In December 2002, the business team reported to the senior accountant that GE would store the locomotives on GE property until they were delivered to the railroad end users.  At the time, the senior accountant was aware that while on GE's property, GE would be required to (a) run the locomotives in idle to prevent damage from the cold; (b) fuel and monitor the idling locomotives; and (c) provide security to the locomotives.

63.     On  December 16 and 17, 2002, the business team met again with the senior accountant and told him that, under the bridge financing agreements with the financial intermediaries, GE was involved in the financial intermediaries' resale of the locomotives to the railroads.  First, if the railroads did not timely pay the financial intermediaries, GE was obligated under its agreements to pay the financial intermediaries a penalty fee calculated as a percentage (from 5-7.5% per annum) of the outstanding balance from the day the railroads' payment was due until it had been paid in full.  Second, GE had agreed to indemnify one of the railroad end users for the possible tax consequences of the transaction that could result to the railroad after it purchased the locomotives from the financial intermediary.  If the indemnification provision were triggered, the cost to GE would be anywhere between $2 to 4 million.  In addition, the business team also told the senior accountant that the financial intermediaries were responsible for the costs of storing and insuring the locomotives while the intermediaries owned the locomotives.

64.     Notwithstanding their awareness of these terms of these rail transactions, members of the corporate accounting group permitted GE to recognize the revenue and income on these deals in the fourth quarter of 2002.

65.     In its Form 10-K filed with the Commission on March 7, 2003, GE included the revenue and operating profit for the 2002 bridge financing transactions in both the reported results for GETS and in the consolidated GE financial statements for the fourth quarter and fiscal year 2002.  These transactions accounted for 131 of the 191 locomotives purportedly sold by GETS in the fourth quarter of 2002 (68.6%); $223 million of the $717 million in reported quarterly GETS revenue (31.1%); and $38 million of the $134 million in reported GETS operating profit (28.4%).  Inclusion of these transactions significantly overstated the performance of the GETS business in the fourth quarter of 2002, with GETS revenues and profits being overstated by 45.1% and 39.6% respectively.

**B.     GE's Audit Staff Raises Revenue Recognition Concerns**

66.     In the first few months of 2003, Corporate Audit Staff conducted an audit of the GETS business and identified certain provisions of the bridge financing transactions which called into question whether GE had transferred ownership risks to the financial intermediaries.  The first was the penalty clause, which had been previously disclosed to GE's corporate accounting group in December 2002.  In addition, Corporate Audit Staff discovered that, in several side letters and verbal agreements, GE had agreed to reimburse the financial intermediaries for their cost of storing and insuring the locomotives during their "ownership" of the locomotives.  Contemporaneous documents indicate that the business team had requested that the financial intermediaries avoid

explicitly stating in their invoices that GE was paying for the costs of storage and insurance for fear of negatively impacting GE's revenue recognition in the quarter.

67.     In mid-March 2003, Corporate Audit Staff elevated the two issues to the senior accountant that had been most involved in approving the revenue recognition on the transactions, expressing concern that the penalty provisions and reimbursement agreements might preclude revenue recognition. The senior accountant had been aware of the penalty provisions but not the reimbursement agreements; however, this new information did not cause him to change his decision to recognize this revenue.

### C.     The 2003 "Bridge Financing" Transactions

68.     In 2003, the business team again presented year end rail transactions to the same senior accountant. The purpose, terms, and structure of the 2003 transactions were to be the same as in 2002 except for one difference. For the 2003 deals, the business team would try to negotiate removal of the penalty fee. By the end of 2003, however, the senior accountant learned that GE had, in fact, failed to remove the penalty clause from one of the 2003 rail transactions. GE again entered into side letters to reimburse the financial intermediaries for the costs of storage and insurance.

69.     In December 2003, the business team informed the senior accountant that the financial intermediaries had requested that GE represent that the rail transactions had been disclosed to GE's outside auditor and accounted for in accordance with GAAP. When he asked why the financial intermediaries were seeking the representation, the senior accountant was told they were concerned about their risk of liability for helping influence another company's financial statements in the wake of a recently reported financial scandal. As in 2002, notwithstanding the above, GE's corporate accounting

group permitted GE to recognize the revenue and income on the year-end rail deals in the fourth quarter of 2003.

70.     In its Form 10-K filed with the Commission on March 1, 2004, GE included the revenue and operating profit for the 2003 bridge financings in the fourth quarter and fiscal 2003 financial statements for both GETS and GE.  For the fourth quarter of 2003, the rail transactions accounted for 92 of the 215 locomotives purportedly sold (42.8%) by GETS; $158 million of the $857 million in GETS revenue (18.4%); and $24 million of the $168 million in GETS operating profit (14.3%).  Inclusion of these transactions significantly overstated the performance of the GETS business in the fourth quarter of 2003, with GETS revenues and profits being overstated by 22.6% and 16.7%.

### D.     GE Concludes That Year-End Rail Transaction Revenues Were "Inappropriately Accelerated"

71.     On July 27, 2007, GE reported in its Form 10-Q filed with the Commission for the quarter ended June 30, 2007 that the revenues from the year-end rail transactions had been "inappropriately accelerated" into the fourth quarters of 2002 and 2003 when they should have been recognized in the first quarters of the following years. GE concluded that revenue recognition in the fourth quarters was inappropriate because GE transferred locomotive titles but not sufficient substantive risks and rewards of ownership to financial intermediaries.  GE adjusted its historical financial statements and admitted that the revenues and profit for the reported business segments containing the year-end rail transactions were overstated by 8.8% and 14.6%, respectively, in the fourth quarter of 2002 and overstated by 22.6% and 16.7%, respectively, in the fourth quarter of 2003.

72.     GE's improper recognition of revenue and profit for the bridge financings in the fourth quarters of 2002 and 2003 resulted in the public dissemination of false and misleading financial information in Commission filings and other communications. Inclusion of revenues and profit for these transactions in the fourth quarters of 2002 and 2003 violated GAAP (a) because risk of loss did not properly transfer and (b) GE maintained significant continuing performance obligations that precluded revenue recognition.

## IV.     The Aircraft Engine Spare Parts Error

73.     In March 2002, GE changed how it accounted for its sale of commercial aircraft engine spare parts in two ways.  First, GE removed sales of spare parts from a model used to account for sales of aircraft engines that resulted in an immediate $844 million charge to revenue.  Second, to offset that charge and to avoid disclosure of its original accounting, GE simultaneously made a second, related change to another accounting model.  That second change did not comply with GAAP.  GE's error improperly overstated GE's 2002 net earnings by approximately $585 million.

### A.     The Revenue Accounting Model for Aircraft Engine Sales

74.     Beginning in 1992, GE applied an accounting model, known as RAM (Revenue Accounting Model), to its sales of new commercial aircraft engines.  Applying this model, GE "levelized margins" within its commercial aircraft business by combining low margins from aircraft engine sales with high margins from the expected future sale of spare parts/spare engines for those aircraft, recognizing an "average" margin in its earnings for a set time period.  To account for the acceleration of the margin recognized on as-yet unsold spare parts, GE maintained on its balance sheet a "deferred charge

24

balance" (reported as an "other asset") equal to the amount of income it accelerated using RAM. The deferred charge balance was amortized over time to reduce recognition of profit on future spare parts and spare engine sales in an amount equal to the profit reduction on those sales.

75.      Beginning in at least 1999, GE became concerned that RAM might not comply with GAAP. If the model was not compliant with GAAP and GE had to correct the accounting, GE's pre-tax income would be immediately negatively impacted by the amount in the deferred charge balance, at the time approximately $1 billion, which would instead have to be recognized over the life of an aircraft engine as spare parts were sold to customers. In early February 1999, a senior accountant in GE's corporate accounting group sent a powerpoint describing GE's outside auditor's view that, if GE's practice of recognizing margin on spare parts pursuant to RAM "Was Observed and Challenged [it is] . . .Virtually Assured We Would Lose." In mid to late 1999, with no objection from its outside auditors, GE decided to continue to recognize revenue on spare parts pursuant to RAM. To minimize the impact if the SEC were to determine that RAM was invalid and to force a restatement, GE funded a $106 million write down of the deferred charge balance in an effort to keep it from increasing.

76.      In early 2001, GE's proposed acquisition of another entity presented an opportunity to end GE's RAM accounting in a way that would avoid public disclosure of the practice. A January 2001 document stated that "pooling [in connection with the acquisition] was a one-time opportunity to 'cure' RAM." The document stated that RAM's "accounting justification [was] crumbling" based on expected GAAP changes in 2001 and 2002, and that the "$1 billion unexplained balance in GE's [deferred charge

balance] could draw the attention of the SEC and would not survive." The powerpoint implied that such a change could be accomplished without having to make a disclosure.

### B.     GE's Accounting for Spare Parts Sales in Customer Service Agreements

77.     In 2001, at the same time the RAM issue existed, a separate issue arose relating to GE's recognition of profit margin on spare parts. Specifically, a GE business unit which sold aircraft engine spare parts to customers pursuant to customer service agreements or "CSAs" learned that it was paying a higher internal price to GE's parts distribution business for engine parts than certain third parties were paying GE for the same parts. In 2001, the business unit complained internally that paying the higher "catalog list price" put it at a competitive disadvantage with customers and argued that it should pay the lower "market price" which GE charged third parties.

78.     There was a potential accounting effect to making such a change. GE had recognized revenue from CSAs on a "cost percentage of completion" basis. Under this method, GE estimated the total costs and profits of each agreement; calculated the percentage of total costs incurred as of a particular date; and recognized revenue proportionate to the costs incurred as of that date. Through the end of 2001, the CSA business "paid" to GE's parts distribution unit the catalog list price for the parts.

79.     Individuals at GE initially suggested if the CSA business paid a lower price for parts, pursuant to the "cost percentage of completion" method, the total costs on the contract would decrease, the percentage of total costs incurred to date would therefore increase, and the corresponding revenue that GE could recognize would increase. GE accountants estimated that making the internal pricing change would cause an immediate

acceleration in revenue and profit, referred to as a "cumulative catch up," of approximately $140 million.

80.     In a November 12, 2001 email, a senior GE corporate accountant rejected the idea, remarking correctly that it was not possible to affect GE's consolidated earnings through an internal price change.  Under GAAP, as consolidated statements are based on the assumption that they represent the financial position and operating results of a single business enterprise, such statements should not include gain or loss on transactions among the companies in the group. Accordingly, any intercompany profit or loss on assets remaining within the group should be eliminated.

**C.     GE's Corporate Accounting Group Creates An
Offset to the RAM Change to Avoid Disclosure**

81.     Shortly after rejecting the proposal to accelerate revenue from the internal price change, the same senior GE accountant proposed to link a similar internal price change to the elimination of RAM accounting for spare parts.  The principal motive for the offset proposal was to be able to discontinue using RAM to account for sales of spare parts and to avoid having to disclose the large negative earnings impact that would result if spare parts were taken out of RAM.

82.     The senior accountant proposed that the distribution business transfer spare parts to the CSA business at cost (as opposed to either "catalog list price" or "market price"), in effect shifting the recognition of the spare parts profit from one GE aircraft engine business unit to another.  On a consolidated basis, GE's profit, total costs, and revenue over the life of the CSAs would remain the same, but the spare parts profit would now be recognized by the CSA business on the cost percentage of completion basis.

83.    The senior accountant hoped this proposed change could create a positive earnings impact sufficient to offset the large charge that would result from the exclusion of spare parts from RAM.  On November 13, 2001, the senior accountant wrote that his proposal would allow GE to "quietly" eliminate spare parts from RAM.

84.    On February 19 and 20, 2002, in discussions about how to account for the internal pricing change, the senior accountant was informed by both a finance employee and a senior accountant in GE's aircraft engines business that there were two ways to make the change.

85.    One proposed alternative would apply the change from catalog list price to cost for existing CSAs prospectively, *i.e.*, on a going forward basis only.  This would have the effect of (a) keeping the costs on the contracts incurred to date the same and (b) reducing the total estimated costs, thereby generating a higher contract margin. Application of this higher margin to the already incurred costs would generate a "cumulative catch up" equal to the difference between the previously applied lower margin and the new higher margin.  GE calculated the cumulative catch-up would equal approximately $1 billion in revenue and profits, more than enough to offset the estimated $844 million negative impact from the elimination of spare parts from the RAM model.

86.    The other alternative was to make the price change both retrospectively and prospectively, *i.e.*, recalculating the total costs of the contract as though the lower price had been in effect from the start of the contract.  The senior corporate accountant was informed that doing this would result in no cumulative catch-up.  While the margins would now be greater, the total costs incurred to date would also have decreased,

28

basically resulting in a net zero impact.  Application of the change retrospectively, then, would not have generated a cumulative catch-up to offset the proposed change in RAM.

87.     Under Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20"), accounting principles should be applied consistently for all periods presented in comparative financial statements.  As a result, under GAAP, GE was required to apply any change in accounting principle, such as the internal price change, retrospectively (in this case, from day one of the contracts at issue).

88.     On March 27, 2002, senior GE corporate accountants and members of the aircraft engines' business had a conference call to discuss the matter further.  On the call, GE's corporate accountants decided to implement both the RAM change, creating a $844 million charge to revenue and earnings, and a prospective-only internal pricing change, creating an approximately $1 billion "cumulative catch-up" of revenue and earnings in the first quarter of 2002.

89.     As noted above, the decision to make the internal pricing change on a prospective-only basis did not comply with GAAP.  GE never memorialized why a prospective-only change was GAAP-compliant.

### D.     The Improper Creation/Use of a Reserve and GE's Failure to Disclose the RAM or Internal Price Changes

90.     As of the end of the first quarter of 2002, the impact from applying the internal price change prospectively was estimated to increase GE's earnings by approximately $1 billion and the impact of the RAM change was estimated to be an $844 million charge to earnings.  Rather than recognizing the entire approximately $1 billion from the internal price change, GE recognized only as much as it needed to offset the

impact of the RAM change ($844 million). Out of this difference, GE created a reserve of $156 million.

91.    The creation of the $156 million reserve also did not comply with GAAP. Under GAAP, even if it had been proper for GE to recognize the approximately $1 billion in increased revenue and earnings, GE should either have (1) recognized the entire approximately $1 billion in the first quarter and "trued up" the number in later quarters based on future analysis of the CSAs or (2) not recognized any gain on the switch until it had completed its analysis.

92.    While GE indicated that it would amortize the deferred gain in proportion to further contract reviews, at least a portion of the reserves – perhaps as much as $42 million – was released over the following two quarters to offset the negative earnings impact that GE otherwise would have experienced in those quarters due to the first quarter internal pricing change. GE's release of the reserve to offset later period earnings shortfalls caused by the first quarter internal pricing change did not comply with GAAP.

93.    GE did not disclose either the RAM change or the effect of the internal pricing change in any of its 2002 Commission filings.

94.    On January 18, 2008, GE filed a Form 8-K with the Commission that announced it was adjusting its financials from 2002 to 2007 due to its erroneous decision to apply the catalogue list price to cost change on a prospective-only basis. The error resulted in GE overstating its 2002 pre-tax earnings by $943 million, or 5.7 %, and its 2002 net earnings by $585 million, or 4.8%.

### V.    Offer or Sale of GE Securities During Relevant Period

95.    Throughout the relevant period, shares of GE common stock were continuously offered for sale, sold and purchased on the New York Stock Exchange

96.    In addition, GE itself offered securities for sale at the same time its financial statements contained materially false statements.  For instance, in March 2004, GE offered approximately 119 million shares of newly issued GE common stock for sale to the public at $31.83.  In April 2004, GE used approximately 342 million shares of newly issued shares of GE common stock to acquire Amersham plc.  In addition, in March 2003, June 2003, January 2004 and December 2004, GE made additional acquisitions that were paid for in whole or in part with GE common stock.

### FIRST CLAIM
### Fraud In Connection With The Purchase Or Sale Of Securities in Violation of Exchange Act § 10(b) and Rule 10b-5

97.    Plaintiff Commission repeats and realleges paragraphs 1 through 52 and 57 through 72 above.

98.    As described above, GE, acting primarily through senior corporate accountants, engaged in knowing or reckless fraudulent activities resulting in numerous materially false and misleading statements or omissions in connection with the January 2003 change in CP hedging methodologies and the recognition of revenues and profits in the fourth quarters of 2002 and 2003 for the bridge financing transactions.

99.    By reason of the foregoing, GE, singly or in concert with others, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means and instrumentalities of interstate commerce, or of the mails, or any facility of any national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b)

made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of GE securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

100.    The conduct of GE involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**SECOND CLAIM**
**Fraud in the Offer or Sale of Securities Arising from Treatment of CP Hedging and "Bridge Financing" Transactions in Violation of Securities Act § 17(a)**

101.    Plaintiff Commission repeats and realleges paragraphs 1 through 52 and 57 though 72 above.

102.    By reason of the foregoing allegations relating to the January 2003 change in CP hedging methodologies and the recognition of revenues and profits in the fourth quarters of 2002 and 2003 for the bridge financing transactions, GE, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in

32

transactions, practices or courses of business which operated or would operate as a fraud or deceit upon certain purchasers, including purchasers of GE securities.

103.    The conduct of GE involved fraud, deceit, manipulative or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

### THIRD CLAIM
### Non-Scienter Fraud in the Offer or Sale of Securities Arising from Spare Parts Internal Price Changes in Violation of Securities Act Sections 17(a)(2) and (3)

104.    Plaintiff Commission repeats and realleges paragraphs 1 through 7 and 73 through 96 above.

105.    By reason of the foregoing allegations relating to GE's treatment of its spare parts internal price change GE, directly or indirectly, acting negligently, by use of the means or instruments of transportation or communication  in interstate commerce or by the use of the mails, in the offer or sale of securities: obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon certain purchasers, including purchasers of GE securities.

### FOURTH CLAIM
### Reporting of False and Misleading Information in Annual Statements in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-1

106.    Plaintiff Commission repeats and realleges paragraphs 1 through 96 above.

107. By reason of the foregoing, GE reported misleading information in its Forms 10-K for the years ended December 31, 2002, December 31, 2003 and December 31, 2004 in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

### FIFTH CLAIM
### Reporting of False and Misleading Information in Quarterly Reports in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-13

108. Plaintiff Commission repeats and realleges paragraphs 1 through 96 above.

109. By reason of the foregoing, GE reported misleading information in its Forms 10-Q for the quarters ended March 31, 2002, June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004, September 30, 2004, March 31, 2005, June 30, 2005, September 30, 2005, March 31, 2006, June 30, 2006 and September 30, 2006 in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-13].

### SIXTH CLAIM
### Reporting of False and Misleading Information in Forms 8-K in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-11

110. Plaintiff Commission repeats and realleges paragraphs 1 through 96 above.

111. GE reported misleading information in earnings releases issued in connection with Forms 8-K filed with the Commission on or about April 11, 2002; July 12, 2002; September 17, 2002; January 17, 2003; April 11, 2003; January 16, 2004; April 8, 2004; July 9, 2004; October 8, 2004; January 21, 2005; April 15, 2005; July 15, 2005;

October 14, 2005; January 20, 2006; April 13, 2006; July 14, 2006; October 13, 2006;
January 19, 2007; April 13, 2007; and July 13, 2007 in violation of Section 13(a) of the
Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R.
§§ 240.12b-20 and 240.13a-11].

### SEVENTH CLAIM
**Failure to Keep Accurate Books and Records
in Violation of Exchange Act § 13(b)(2)(A)**

112.    Plaintiff Commission repeats and realleges paragraphs 1 through 96
above.

113.    By reason of the foregoing, GE failed to maintain and keep books,
records, and accounts which, in reasonable detail, accurately and fairly reflected the
transactions and dispositions of GE's assets in violation of Section 13(b)(2)(A) of the
Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### EIGHTH CLAIM
**Failure to Maintain Internal Controls
in Violation of Exchange Act § 13(b)(2)(B)**

114.    Plaintiff Commission repeats and realleges paragraphs 1 through 96
above.

115.    By reason of the foregoing, GE failed to devise and maintain a system of
internal accounting controls sufficient to provide reasonable assurances that the
company's transactions were recorded as necessary to permit preparation of financial
statements in conformity with GAAP or other criteria applicable to such statements and
to maintain accountability for assets in violation of Section 13(b)(2)(B) of the Exchange
Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a

Final Judgment:

### I.

A.      Permanently enjoining GE from violating, directly or indirectly:

1.      Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

2.      Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

[17 C.F.R. § 240.10b-5] thereunder;

3.      Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-

20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-

11, and 240.13a-13; and

4.      Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§

78m(b)(2)(A) and 78m(b)(2)(B)].

### II.

Requiring GE to pay civil money penalties pursuant to Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

### III.

Ordering such other and further relief as this case may require under equity and

the Court deems appropriate.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorney,

_____
Luke T. Cadigan (Fed. Bar No. phv0552)
  Senior Trial Counsel
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8919 (tel)
(617) 573-4950 (fax)

Local Counsel:

_____
John B. Hughes (Fed. Bar No. CT-05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3802 (tel)
(203) 773-5373 (fax)

Dated: August 4, 2009